LUDLOW EDUCATION ASSOCIATION & others[1] *vs.* TOWN OF
LUDLOW & another.[2]

No. 89-P-1364.

Hampden. March 13, 1991. - July 23, 1991.

Present: PERRETTA, SMITH, & GILLERMAN, JJ.

*Municipal Corporations*, Group insurance, Collective bargaining. *Insurance*, Group, Health care organization. *Labor*, Health benefit plan, Grievance procedure. *Contract*, Collective bargaining contract. *Administrative Law*, Exhaustion of remedies. *Damages*, Health benefit plan reduction. *School and School Committee*, Collective bargaining, Group insurance.

A dispute between a town and an employee union with respect to the town's modification of group health benefit plans available to certain employees was neither governed by the collective bargaining agreement nor an appropriate matter for the Labor Relations Commission inasmuch as the dispute involved the interpretation of a statute. [115-116]

A town that reduced its percentage contribution to premiums for its employee health benefit plans established pursuant to G. L. c. 32B, without reaching an agreement to the change in premium through collective bargaining, violated the provisions of St. 1988, c. 23, § 77A. [116-118]

A private right of action arose in favor of municipal employees injured as a result of action by a governmental unit in violation of the provisions of St. 1988, c. 23, § 77A, where § 77A exhibited a special legislative concern for an identified interest of employees of governmental units but failed to provide a remedy for the violation of its terms. [118-120]

An action by municipal employees whose contributions to their G. L. c. 32B health benefit plans were unilaterally increased by the municipality in violation of St. 1988, c. 23, § 77A, was remanded for an evidentiary hearing to establish the amount of damages to which certain members of the plaintiff class were entitled. [120-122]

---

[1]Brian T. Connery, William Koscher, Ann Irvine, and Stephen Marino, individually and on behalf of a class of persons similarly situated.

[2]School committee of the town of Ludlow. Amicus curiae briefs were filed by the town of Arlington and by the Arlington Education Association.

CIVIL ACTION commenced in the Superior Court Department on December 14, 1988.

Motions for summary judgment were heard by *George C. Keady, Jr.,* J., and *Andrew Gill Meyer,* J., and a final judgment was entered by *Meyer,* J.

*Margery E. Williams* for the plaintiffs.

*Alice E. Zaft* for the defendants.

*John F. Maher,* Town Counsel, *& Philip Collins,* for the town of Arlington, amicus curiae, submitted a brief.

*Margery E. Williams,* for Arlington Education Association, amicus curiae, submitted a brief.

GILLERMAN, J. Seeking to reduce the town's operating costs, the selectmen of Ludlow (the town) substantially modified the group health benefit plans available to its educational personnel.[3] The effort was opposed by a complaint for declaratory judgment, injunctive relief, and damages brought by four individuals who appeared individually and on behalf of approximately 215 educational personnel employed by the town who had enrolled or who might in the future enroll in health insurance plans offered by the town (the class)[4] and by the Ludlow Education Association (the union), the collective bargaining representative of the class. The defendants are the town and its school committee, the town's bargaining representative.

The plaintiffs obtained partial summary judgment on the ground that the town, in making the changes in the plan, had violated applicable statutes which prohibited the shifting of the cost of insurance premiums from the governmental unit to its employees, but the judge did not award relief to the class. A second judge entered final judgment for the plaintiffs

---

[3]For an earlier case involving other employees of the town who asserted the same claim as is alleged here, see *Uniformed Firefighters of Ludlow, Local 1840* v. *Selectmen of Ludlow,* 29 Mass. App. Ct. 901 (1990). In footnote 6 to our rescript opinion in that case, which vacated the judgment of dismissal and remanded the case to the Superior Court, we noted the pendency of this appeal in our court and suggested that upon remand the *Firefighters* case be stayed pending our decision in this case.

[4]An order was entered April 12, 1989, certifying the four individual plaintiffs as representatives of the class and permitting them to maintain the action as a class action. See Mass.R.Civ.P. 23, 365 Mass. 767 (1974).

on liability and, declining to award damages for the additional premiums paid by town employees, ordered the parties to the bargaining table to agree on damages. The result was cross-appeals from the final judgment, the plaintiffs claiming the second judge was wrong, and the defendant town claiming that the first judge was wrong.

The material facts, which are not in dispute, and the statutory background, knowledge of which is necessary to an understanding of the controversy, may be summarized as follows. In 1955 the Legislature enacted G. L. c. 32B, § 3, inserted by St. 1955, c. 760, § 1, authorizing governmental units, upon acceptance of its provisions, to purchase group indemnity hospital and medical insurance, such as Blue Cross/Blue Shield, for municipal employees and their dependents. General Laws c. 32B, § 7, required that the premium cost be shared equally between the governmental unit and the employee. In 1971, § 16 was added to c. 32B, by St. 1971, c. 946, § 5. Under the terms of that act, upon its acceptance by a governmental unit, employees could elect health care coverage provided by a health care, or health maintenance, organization (HMO). As expanded by a 1976 amendment (St. 1976, c. 454, § 2), § 16 tied HMO premium cost to the cost of indemnity premiums by requiring the governmental unit to make its contribution to the cost of an HMO premium "the same amount as" its contribution to the cost of an indemnity premium.

At least since 1983, according to uncontradicted affidavits, the town offered both types of plans to the class, an indemnity plan pursuant to G. L. c. 32B, § 3, and an HMO plan pursuant to G. L. c. 32B, § 16. On July 1, 1987, the town added another HMO to these options, Health New England. The town contributed fifty percent of the premium of the indemnity plan, as it was required to do by G. L. c. 32B, § 7, and an equal *dollar* amount to the HMO premium, which, this court has held, the town was required to do by the provi-

sions of G. L. c. 32B, § 16. *Hemman* v. *Harvard Community Health Plan, Inc.*, 18 Mass. App. Ct. 70, 72-73 (1984).[5]

We observed in *Hemman, supra* at 74 n.7, that when § 16 was enacted the cost of HMO coverage was generally more expensive than indemnity type coverage, but in the succeeding years the cost of HMO premiums has dropped below the cost of indemnity premiums. Because of the equal dollar rule recognized in *Hemman*, the town's *percentage* share of the less expensive HMO premiums grew to be greater than fifty percent while its share of the indemnity premiums remained at the fifty percent level specified by § 7.[6] By 1988 the town's equal dollar share of HMO premiums represented approximately eighty percent of the premium cost of family plan HMO coverage.

Beginning in April, 1987, the town's insurance advisory committee, see c. 32B, § 3, began exploring ways to reduce the town's over-all cost of providing group health insurance to its employees. On May 9, 1988, after five meetings, the advisory committee voted to recommend to the selectmen (i) the discontinuance of Health New England and (ii) the adoption of a "melded rate" rate plan under which employees, for identical premiums, could elect either Medical West,

---

[5]In *Hemman* v. *Harvard Community Health Plan, supra,* we reviewed the provisions of G. L. c. 32B, § 16, as amended through St. 1976, c. 454, § 2, which made available to employees of cities and towns the option to elect HMO coverage in place of indemnity type coverage. Section 16, as we have said, tied HMO premiums to indemnity premiums by providing that the contribution of the city or town to the HMO plan "shall be the same amount as and shall not exceed" the contribution of the city or town to the indemnity plan. The contribution of the city or town to an indemnity plan was required to be fifty percent of the premium, the employee to pay the remaining fifty percent. See G. L. c. 32B, § 7. We held in *Hemman* that § 16 required the town of Norwood to contribute toward the premium charged by the defendant HMO the same *dollar* amount as the town's contribution to indemnity type coverage — rather than an equal percentage of the premium charged by the indemnity plan. We emphasized the specific language and purpose of G. L. c. 32B, § 16. *Id.* at 72-74. See *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59* v. *Chatham,* 404 Mass. 365, 370-371 (1989).

[6]The town could elect to contribute more than fifty percent by adopting the provisions of G. L. c. 32B, § 7A, and proceeding under the provisions of that section. See *Broderick* v. *Mayor of Boston,* 375 Mass. 98 (1978).

a Blue Cross/Blue Shield affiliated HMO, or Blue Cross/ Blue Shield Master Health Plus, an indemnity plan. The advisory committee included a representative of the union who joined in the favorable vote of the majority on May 9. The financial result was a slightly lowered premium for the indemnity plan and a substantially increased premium for the HMO. At the heart of the melded rate plan was the lowered cost of the plans to the town, but more important to this litigation was the town's contribution of exactly fifty percent to the HMO premium cost. That meant that the town reduced its percentage contribution to the HMO premium cost and increased the percentage contribution of the seventy-seven employees who were then enrolled in HMOs.

The minutes of the May 10, 1988, meeting of the selectmen refer to the discussion of two subjects which bear on this controversy. First, the melded rate plan was anticipated to yield a savings to the town of approximately $130,000. Second, the selectmen were told that an "anti-roll back bill . . . is on the Governor's desk" which, if signed, would have an "impact . . . on [the] cost [of insurance to the town]." The selectmen were also told that the anti-roll back bill "is to protect the employee."

Prior to the meeting, the selectmen were informed in writing that the union had changed its vote of May 9 and had decided to oppose any change in the group health insurance plans. Nevertheless, on May 10, 1988, the selectmen voted to adopt the melded rate plan, and, on the same day, the Governor did, indeed, sign the so-called anti-roll back amendment, St. 1988, c. 29, § 3, amending c. 23 of the Acts of 1988 by inserting § 77A, the provisions of which appear in the margin.[7] Section 77A took effect upon its approval, on May 10,

---

[7] "Section 77A. Notwithstanding the provisions of chapter one hundred and eighteen F of the General Laws, a health benefit plan established pursuant to chapter thirty-two A or thirty-two B of the General Laws may not require an employee to pay a premium percentage, deductible or coinsurance amount which is greater tha[n] the premium percentage, deductible or coinsurance amount required to be paid by the employee under the plan in effect when said chapter one hundred and eighteen F became effective; provided, however, that a health plan established pursuant to said chapter

1988. The new melded rate plan did not become operative until July 1, 1988. The parties assume, as do we, that the new plan became subject to the provisions of § 77A. In brief, § 77A provides that the "premium percentage" contributed by a municipal employee toward a group health benefit plan shall not be increased unless the increase is the product of collective bargaining.

1. *Jurisdictional issues.* The town makes two threshold arguments: the plaintiffs failed to pursue the grievance procedure provided by the collective bargaining agreement, and the plaintiffs failed to exhaust their administrative remedy by proceeding before the Labor Relations Commission under the provisions of G. L. c. 150E. Neither argument is persuasive.

Article I of the collective bargaining agreement provides that a "grievance is a claim based upon an event or condition which affects the employee or group of employees regarding the interpretation, meaning, or application of any term of this Contract." There is no "term of [the] Contract" that is in dispute in this case. The briefs and arguments of the parties have properly focused on § 77A; it is that statutory provision, not the contract, which must be interpreted and applied, and as in *Willis* v. *Selectmen of Easton*, 405 Mass. 159, 164 (1989), the plaintiffs were "not obligated to submit [their] dispute to the grievance procedure because the collective bargaining agreement does not govern [their] dispute."

Nor is this an appropriate case for the Labor Relations Commission. As we said in *Uniformed Firefighters of Ludlow, Local 1840* v. *Selectmen of Ludlow*, 29 Mass. App. Ct. 901, 903 (1990), "[o]nly questions of law are involved in the

thirty-two A or thirty-two B shall provide benefits which are no less than the benefits provided under the plan in effect when said chapter one hundred and eighteen F became effective; provided, further, that nothing in this section shall preclude the parties to a collective bargaining agreement under chapter one hundred and fifty E of the General Laws from agreeing to any change in the premium percentage, deductible, or coinsurance amount which an employee is required to pay or to a change in benefits provided in a health plan established under the provisions of said chapter thirty-two A or thirty-two B."

present case, not disputed facts. Moreover, there is no issue relating to the conduct of labor relations or the interpretation of a collective bargaining agreement which might be appropriate for exercise in the first instance of the commission's expertise." Further, the statutory issues involving § 77A are presented for the second time, the questions have been fully briefed and argued, and judicial economy, if nothing else, requires that we now decide the controversy.

2. *The statutory issue.* Section 77A applies to *any* "health benefit plan established pursuant to chapter . . . thirty-two B of the General Laws" (see note 7, *supra*) and thus affects plans adopted under c. 32B, § 3 (indemnity plans), *and* those adopted under c. 32B, § 16 (HMO's). Section 77A goes on to provide that, absent a contrary provision in a collectively bargained agreement, any such plan "may not require an employee to pay a premium percentage . . . which is greater than the premium percentage . . . [previously] required to be paid by the employee under the plan in effect when [c. 118F[8]] became effective [April 21, 1988] . . . ." Section 77A, then, prohibited a city or town from reducing its *percentage* contribution to premiums for any health benefit plan because the necessary effect would be to increase the employees' "premium percentage" of the cost of the plan. Under the changes unilaterally adopted by the town in this case, the premium percentage paid by Ludlow employees for the HMO plan was substantially increased and the town's percentage correspondingly decreased. On its face, then, § 77A would bar the action taken by the town.

The principal argument of the town is that § 77A, which was enacted as an amendment to the Universal Health Care Act, St. 1988, c. 23, must be construed along with c. 32B "as a harmonious whole," and, because c. 32B, § 7, prohibits a governmental unit from paying more than fifty percent of the cost of the premium,[9] the town's plan was in compliance with c. 32B. It would make no sense, the argument

---

[8]Inserted by St. 1988, c. 23, § 45 (the Universal Health Care Act).
[9]See, however, note 6, *supra*.

goes, to validate the melded rate plan under c. 32B and proscribe it under § 77A. ·

It is true that the adoption by the town of two plans with a melded rate, that is to say, an identical rate for both an indemnity plan and an HMO plan, did not, without more, violate any provision of G. L. c. 32B. Certainly the melded rate did not violate § 16; it was precisely in conformance with the equal dollar rule applied in *Hemman.* What the argument of the town fails to recognize is that § 77A, having been made applicable to all c. 32B plans, has set out conditions with which all such plans must comply. The mandate of § 77A is that, absent the approval of the union as the collective bargaining representative of the class, *no* plan may require an employee to increase his or her premium percentage contribution. The whole is made "harmonious" by recognizing that changes in outstanding plans must take account of and be in compliance with § 77A. There is nothing in c. 32B that is inconsistent with this result. Certainly the town, which was no longer free to revoke or rescind its acceptance of § 16, see G. L. c. 32B, § 10; *Broderick* v. *Mayor of Boston*, 375 Mass. 98, 99 (1978), is bound by the statutory change which became effective almost two months before the plan changes became effective (July 1, 1988). Indeed, at the meeting of the selectmen on May 10, 1988, the town was put ·on notice of the risk it took in approving the new plan without the approval of the union.

The town argues further that because it had been paying more than fifty percent of the HMO premiums it was in violation of c. 32B, and that by adopting the melded rate it resumed compliance with the statute. Again, the argument has no merit; the town was not in violation of c. 32B. The fifty percent limitation applied only to indemnity plans, see § 7; the HMO limitation in § 16 is a dollar amount, as we held in *Hemman*, and the town was always in compliance with that limitation.

The town of Arlington argues in an amicus brief that the premium percentage increase referred to in § 77A applies only to employee contributions to an indemnity plan, not to

contributions to an HMO plan. This argument fails because, as we noted earlier, § 77A expressly applies to all plans — indemnity and HMO — adopted under c. 32B.[10]

The evident legislative purpose in enacting § 77A was to prevent any increase in premium percentages payable by employees for coverage in any c. 32B plan, absent agreement to the increase in the collective bargaining process. There was no such agreement here, and we conclude that by increasing the premium percentage payable by some members of the class, the town adopted a plan which was forbidden by the terms of § 77A.

3. *The remedy.* Section 77A prohibited unilateral increases in the percentage contribution by municipal employees to the premium cost of c. 32B plans, but it failed to provide any remedy in the event of a violation of its terms. From these facts the town argues that there is no remedy, other than that ordered by the second judge: to return to collective bargaining.

The issue of a judicially drawn implication of a private cause of action from statutes that omit such a remedy has received scant attention in our reported decisions.[11] *Berdos* v. *Tremont & Suffolk Mills*, 209 Mass. 489 (1911), would appear to be the leading case, but with almost no progeny.

---

[10]Arlington also points to St. 1989, c. 653, § 218, effective January 4, 1990, which terminated the applicability of § 77A to premium contributions to HMO plans, as evidence of what the Legislature meant all along, citing *Fitz-Inn Auto Parks, Inc.* v. *Commissioner of Labor & Indus.*, 350 Mass. 39, 42 (1965) (amendatory legislation regarded as "a clarification of an ambiguity and a legislative interpretation of the original act"). On the contrary, this statute was a "measure that might commend itself to the Legislature as a common sense corrective of . . . section [77A]." *Broderick* v. *Mayor of Boston*, 375 Mass. at 103.

[11]The issue has been extensively developed on the Federal side. The leading case is *Cort* v. *Ash*, 422 U.S. 66 (1975), where the Court identified four criteria relevant to the inquiry: (i) is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" (emphasis original), (ii) is there any indication of a legislative intent to create a private remedy or to deny one, (iii) is the implication of a remedy consistent with the underlying purposes of the statutory scheme, and (iv) is the putative cause of action one traditionally relegated to State law. *Id.* at 78. See generally Note, *Howard* v. *Pierce*: Implied Causes of Action and the Ongoing Vitality of *Cort* v. *Ash*, 80 Nw.U.L. Rev. 722 (1985).

*Berdos* involved a criminal statute prohibiting the employment of a child under the age of fourteen years, but with no provision for a private remedy in the event of a violation causing injury. The plaintiff, then less than fourteen years old and an immigrant who had been in this country barely seven weeks, was injured by a gear in a cotton factory where he was working. The court held that the direction of a verdict for the defendant was error and that the plaintiff was entitled to maintain his action. Relying on virtually the same factors later identified in *Cort* v. *Ash*, 422 U.S. 66, 78 (1975), see note 11, *supra*, the court noted the broad public purpose of the protection of childhood and "the future of mankind," *id.* at 493, from which the court inferred a legislative remedial intent not confined to criminal sanctions, and decided that a civil remedy would be "efficacious . . . [in] compelling observance of the law"; it held, therefore, that the plaintiff, as a member of the protected class, had a right of action against the violator to recover his damages. *Id.* at 493.

It was not until *Gabriel* v. *Borowy*, 324 Mass. 231 (1949), that these principles were again plainly reaffirmed; that case also simplified the analysis. Implying a common law remedy in favor of tenants from a Federal statute prohibiting certain acts of landlords, the court held that "[w]here a statutory right is conferred upon a class of individuals as distinguished from the public at large but no remedy is provided by the statute for the enforcement of the right, the right may be asserted by any appropriate common law remedy that is available. Otherwise, the right would be useless and illusory." *Id.* at 234.

In *Dinsky* v. *Framingham*, 386 Mass. 801, 805-810 (1982), the court discussed the question whether a municipality's failure to enforce the State building code gave rise to a private cause of action. The court held that there was no basis for concluding that the Legislature intended to create private causes of action for property owners in such cases. *Id.* at 809.[12] There being no "special duty owed to the plaintiffs,

---

[12]See also *A.L.* v. *Commonwealth*, 402 Mass. 234, 254 (1988) (O'Connor, J., dissenting).

different from that owed to the public at large," judgment for the defendant was affirmed. *Id.* at 810. *Dinsky* and *Gabriel* repeat the main theme of *Berdos*: where the applicable law evidences a special legislative concern for an identified interest of a group of which the plaintiff is a member, and not merely a concern for the public generally, a private cause of action will be implied if the injury suffered falls within the area of concern.

We have no doubt that § 77A exhibited a special legislative concern for an identified interest of a particular group, the employees of governmental units: their percentage contribution to group health plans was not to be increased without the approval of their bargaining representative. However fleeting that concern may have been, see note 10, *supra*, it is enough to imply a private right of action in favor of municipal employees who have suffered injury as a result of action by a governmental unit in violation of the provisions of § 77A. See *Broderick* v. *Mayor of Boston*, 375 Mass. at 99, 103 (private right of action under c. 32B assumed but not discussed); *Police Commr. of Boston* v. *Boston*, 279 Mass. 577, 581 (1932) (petitioner patrolman, claiming a violation of a statute providing certain rights to compensation, was held to have "an adequate remedy by an action of contract against the city to recover his pay as a patrolman at the rate legally established").

4. *Damages.* We remand this case to the Superior Court for an evidentiary hearing on the question of damages. The following observations are offered for consideration by the judge and the parties, but we do not intend to preclude other arguments based upon the evidence.

The only members of the certified class entitled to damages under § 77A are those who prior to July 1, 1988, were enrolled in Health New England or Medical West and who, on July 1, 1988, became enrolled in the melded rate plan. No other member of the class was required to pay an increased premium percentage. Each qualified member of the class is entitled to the following: for the period beginning July 1, 1988 (the effective date of the melded rate plan), and ending January 4, 1990 (the effective date of St. 1989, c. 653,

§ 218 [see St. 1989, c. 653, § 246], terminating the applicability of § 77A to HMO plans), each employee is entitled to the amount of his or her contribution, less an amount equal to the employee's premium percentage in effect as of April 21, 1988 (the effective date of G. L. c. 118F — see section 2 of the opinion), applied to the HMO premiums that were from time to time in effect on or after July 1, 1988.

When § 77A became inapplicable to employee premium contributions to HMO plans on January 4, 1990, see St. 1989, c. 653, § 218, any entitlement to additional damages by reason of the town's violation of that section expired. Section 218 also mandates that (i) the ten percent floor established in G. L. c. 32B, § 16, as amended through St. 1989, c. 653, § 37,[13] shall not be construed to *reduce* the HMO premium percentage required to be contributed by employees as of January 4, 1990, and (ii) the employee percentage contribution in effect on January 4, 1990, *shall continue in effect* until modified by a collective bargaining agreement.

The town appears to suggest that the fifty percent employee contribution required by the town's melded rate plan is the applicable percentage upon the expiration of § 77A. This suggestion fails to confront the problem that under the law of this Commonwealth "the contribution percentage to be paid on behalf of unionized [public] employees must be collectively bargained by the employer." *Anderson* v. *Selectmen of Wrentham,* 406 Mass. 508, 511 (1990). *School Comm. of Medford* v. *Labor Relations Commn.,* 8 Mass. App. Ct. 139 (1979), *S.C.,* 380 Mass. 932 (1980). Here the town adopted the melded rate plan without proceeding with the mandatory collective bargaining, and under those circumstances the unilaterally imposed contribution percentage rate might not be available as a point of reference in applying § 218.[14]

---

[13]Section 37 became effective July 1, 1990. See St. 1989, c. 653, § 242.

[14]The fact that the town complied with the provisions of G. L. c. 32B, § 3, by resorting to the required advisory committee does not nullify or supersede the town's obligation to bargain collectively in respect of the issue of rates of contribution. For a discussion of the options available to the town following receipt of the report of the advisory committee in which the union did not join, see *Ludlow & Ludlow Fire Fighters Assn., Local 1840,* 17 M.L.C. 1191, 1197 (1990).

. Nevertheless, the union may have waived its right to bargain about the issue of contribution. See *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 570-571 (1983) ("A party may show that the other party clearly and unmistakably waived its right to bargain over an unlawful unilateral change where the other party had actual notice of the proposed change, a reasonable opportunity to negotiate over it, and unreasonably or inexplicably failed to bargain or to request bargaining"). Whether or not the finding of a waiver may be made in this case is a question of fact to be resolved by the judge upon the remand. See *Ludlow & Ludlow Fire Fighters Assn.*, 17 M.L.C. 1191, 1199-1201 (1990), for a careful discussion of the waiver defense in a context similar to that involved here. If the judge finds there was a waiver, damages would then terminate on January 4, 1990, because the melded rate plan would be properly effective at that time.[15] If the judge finds there was no waiver of the union's right to bargain, the judge, in calculating further damages allowable under § 218, would then apply the percentage contribution that would properly have been in effect on January 4, 1990, i.e., the percentage in effect prior to the adoption of the melded rate plan,[16] and apply that percentage to premiums paid after January 4, 1990.

Beginning with the date of our rescript, and consistently with the provisions of § 218, each party is free to demand collective bargaining in respect to employee contributions to the town's health insurance plans.

The judgment is vacated. The matter is remanded to the Superior Court for further proceedings consistent with this opinion, including the assessment of damages in favor of those entitled thereto, and the entry of a final judgment.

*So ordered.*

---

[15]There is no reason to regard the melded rate plan as being void ab initio, and it would not violate public policy to give the plan effect following the expiration of § 77A. Compare *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 55 (1991).

[16]Although there is a dispute between the parties on this factual issue which the judge must resolve upon the remand, both parties acknowledge that the applicable percentage contribution was greater than the ten percent floor of G. L. c. 32B, § 16, as amended through St. 1989, c. 653, § 37.